UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                  No. 08-CR-20212-DT

vs.                                       Hon. Gerald E. Rosen

JEROME CAMPBELL,

                    Defendant.
_____/

OPINION AND ORDER REGARDING DEFENDANT'S MOTION
TO SUPPRESS STATEMENTS AND EVIDENCE ARISING FROM
<u>VEHICLE STOP AND MOTION TO SUPPRESS IDENTIFICATION TESTIMONY</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on         <u>April 20, 2009</u>

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I. <u>INTRODUCTION</u>

Jerome Campbell is charged in a one-count Indictment with distribution of more than five grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1). The charges against Campbell arise out of his sale of drugs to an undercover ATF agent on December 6, 2007. Presently before the Court are two motions filed by Defendant Campbell: (1) a Motion to Suppress Identification Testimony [Dkt. # 15] and (2) a Motion to Suppress Statements and Evidence Arising from Vehicle Stop [Dkt. # 24]. During the course of three days of proceedings on this matter, the Court heard the arguments of counsel and

1

the testimony of Detroit Police Officers Leroy Huelsenbeck, Ryan Connor, and Lori Rodriguez; ATF Agents Donna Averill and Richard Jury; witnesses Barry Black, Kiera Gibson, Darius Jones, and Donna Pacholski; and Defendant Jerome Campbell.    The Court also received into evidence a number of exhibits.  Then, following the close of in-court proceedings, the Court received additional documentary evidence for *in camera* review.

Having observed the demeanor and having heard and considered the testimony of the witnesses and the oral arguments of counsel, and having reviewed and considered the exhibits submitted, the Court makes the following Findings of Fact and Conclusions of Law.  To the extent that any findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any conclusions of law constitute findings of fact, they are so adopted.  This Opinion and Order sets forth the Court's rulings.[1]

---

[1]  Although this matter has been "under advisement" for a substantial length of time, the Court needed this time to await the preparation and filing of all of the hearing transcripts and to thoroughly consider the issues presented.  The Court finds that the under these circumstances, the ends of justice are best served by suspending the 30-day "under advisement" maximum prescribed by 18 U.S.C. § 3161(h)(1)(J).  See S. Rep. No. 212, 96th Cong., 1st Sess. 33-34 (1979); H. R. Rep. No. 390, 96th Cong., 1st Sess. 12 (1979), U.S. Code Cong. & Admin. News 1979, pp. 805, 816 (expressly indicating that "ends of justice" continuances can be employed by trial courts to increase their time to hold a matter "under advisement" beyond the 30-day maximum prescribed by section 3161(h)(1)(J)).

II.  <u>FINDINGS OF FACT</u>

<u>THE AUGUST 1, 2007 VEHICLE STOP</u>

On August 1, 2007, Leroy Huelsenbeck, Ryan Connor and Lanaris Hawkins,

Detroit Police Officers assigned to the joint federal-state "Project Safe Neighborhood"

task force, were on patrol in a semi-marked patrol car in the Northwest District of Detroit,

an area rife with narcotics and violent gang-related activities.  According to the testimony

of Officers Huelsenbeck and Connor, while traveling westbound on Schoolcraft, the

officers observed a black Chevrolet Lumina van with Michigan license plate number

8JHM29 pull out of a driveway in front of Tom's Coney Island restaurant near Westwood

and Schoolcraft, and turn right onto eastbound Schoolcraft without using a turn signal, in

violation of the Detroit municipal code.  Officers Huelsenbeck and Connor also observed

that the driver of the van was not wearing a seatbelt, in violation of Michigan law.

Officer Connor, who was driving the patrol car, therefore, made a u-turn, pulled into the

eastbound lane behind the van, turned on the siren and flashers, and effected a traffic stop

of the vehicle at Warwick and Schoolcraft.[2]  After parking behind the van, the officers

---

[2]  Campbell claims that he was never at Tom's Coney Island on August 1, 2007, and, therefore, could not have been seen by the police committing the traffic violations the officers said they observed.  As such, Campbell contends, the traffic stop was pretextual.  In support of his claim, Campbell testified himself and he also offered the testimony of two witnesses: his cousin Kiera Gibson and Barry Black, a friend of Campbell's son.  The Court does not find Campbell's or his witnesses' testimony credible.  Campbell's testimony was that he left his house on Piedmont with his son and his son's two friends, and turned directly off of Piedmont onto eastbound Schoolcraft, (Tom's Coney Island is west of Piedmont), to take his son to the Super Kmart at Southfield and Ford Road to get some cleats and other athletic equipment before taking

exited their patrol car -- Officer Connor approached the driver's side of the van while Officer Huelsenbeck approached the passenger side of the van and stationed himself at the right rear quarter panel. Huelsenbeck was later joined on the passenger side of the van by Officer Hawkins.

Both Officer Connor and Officer Huelsenbeck testified that as they approached the vehicle, they observed the driver's hands reach toward the ceiling of the van. Although Officer Huelsenbeck testified that he could not tell what the driver was doing because, for safety concerns, his attention was directed toward the other occupants of the van, Officer Connor testified that as he approached the driver's door, he saw the driver shoving a plastic baggie into a gap where the ceiling liner was pulled away from the molding. Officer Connor further testified that when he reached the driver's door, he could see a corner of the plastic baggie protruding from the gap in the ceiling. The driver and all of the occupants were ordered out of the car. Officer Connor removed the baggie and found that it contained three large rocks of cocaine, some pills suspected to be ecstasy, and a few smaller ziplock baggies. Officer Connor testified that after he retrieved the

---

him to football practice. Campbell's then 16- year-old cousin, Kiera Gibson, also testified that Campbell was taking his son to the Super Kmart to get some cleats. However, evidence was presented at the evidentiary hearing establishing that the Super Kmart at Southfield and Ford Road had closed in 2003. The Court does not find Campbell's son's friend, Barry Black, to be a particularly credible witness, either. Black gave particularly vague answers to most of the questions and answered "I don't know" to many of them (including when asked "how tall are you?"). Furthermore, Black's version of what occurred when the police pulled them over is not corroborated by any other witness.

4

contraband, the driver, Jerome Campbell, blurted out, "The dope is mine.  Please don't fuck with my people." [12/15/08 Tr. p. 86-87.]

While Officer Connor dealt with Jerome Campbell and the contraband found on him[3] and in the ceiling of the van, Officer Huelsenbeck dealt with passengers and the passenger compartment.  The three passengers -- all juveniles -- one of whom was Campbell's 11-year-old son, were directed to sit on the curb under the watch of Officer Hawkins.  Officer Huelsenbeck then examined the passenger compartment and found on the floor behind the driver's seat several baggies containing marijuana.

Officers Huelsenbeck and Connor both testified that at the time when they effected the traffic stop they did not know the identity of the driver of the van.  However, prior to August 1, 2007, as task force members, the officers had been briefed by their commanding officers and federal agents as to individuals targeted for investigation by, or "of interest" to, the federal authorities with respect to suspected narcotics and firearm violations.   Task force members were told that if a target or person-of-interest were arrested for any reason, the federal authorities were to be notified.  ATF Task Force Agent Donna Averill testified that Jerome Campbell was one such person "of interest" that she wanted to talk to and that she had informed task force members that if Campbell were ever arrested  to notify her.

Officer Connor testified that in one of these pre-August 1, 2007 task force

---

[3]  Marijuana was found on Campbell's person.

briefings, he was made aware that Jerome Campbell was an individual who the authorities wanted to talk to.  He testified that prior to August 1, 2007, he had been told Campbell's name and had been given a verbal description of him and his vehicle.  However, he stated that he did not know that it was Campbell who was driving the black Lumina when he and his partners observed the motor vehicle violations giving rise to the stop.  He testified that it was not until he had pulled Mr. Campbell over that he made the identification and the connection with him being a  person of interest to the federal authorities.

After Campbell made the statement admitting the drugs belonged to him, he was handcuffed and placed in the patrol car.  The three juveniles were subsequently released to the custody of Darius Jones, Campbell's uncle, who happened to have seen his nephew with the police while he was driving down Schoolcraft on his way to his own home after leaving the driving range at Rouge Park, and stopped to find out what was happening.

Campbell was transported in the patrol car to the Northwest District station by Officers Hawkins and Connor.  Officer Huelsenbeck drove Campbell's van to the station. The trip to the station took five to ten minutes. Campbell was not Mirandized at any time prior to arriving at the station.

According to Officer Connor, while en route to the police station, Campbell voluntarily began a monologue about knowing someone by the name of "Chop" from whom he could obtain a large amount of drugs.[4]  After Campbell concluded his narrative

---

[4]  Campbell denies having voluntarily made any statements while en route to the station.

about "Chop" and his ability to obtain a large quantity of drugs, Officer Connor asked

him how much a rock of cocaine like that found in the van would sell for.  Campbell

responded that it would sell for $25.  Connor commented that that seemed a low amount

of money and Campbell responded that that was what it would sell for in Minnesota.

After they arrived at the station, Agent Averill was notified that Campbell had

been taken into custody.  Agent Averill arrived at the station a short while later.  She

testified that she read Campbell his *Miranda* rights, that he executed a written waiver of

his rights, and that she then proceeded to question him.[5]  Mr. Campbell's responses to

those questions were recorded by Agent Averill in statement form which Campbell

signed.  Campbell admitted having put the cocaine in the ceiling liner of the van.  He was

thereafter charged in a criminal complaint.  *United States v. Campbell*, E.D. Mich. No.

07-30391.  (The complaint was subsequently dismissed, without prejudice, after the

Grand Jury returned its indictment in this case on April 16, 2008.)

THE NOVEMBER 15, 2007 UNDERCOVER BUY

In early November 2007, ATF agents received information from a confidential

informant (CI) that Jerome Campbell (who is also known by the street name "Mozart")

---

[5] At the hearing on this matter, Campbell testified that Agent Averill did not advise him of his *Miranda* rights until after she had extracted statements from him. However, Campbell did not challenge his statements to Agent Averill in his suppression motions and  his attorney affirmatively stated on the record on December 16, 2008 that he was not challenging the statements made by Campbell to Agent Averill; he only is challenging statements made to Officer Connor.  In any event, Campbell does not dispute that he signed a waiver of rights and he admits that Agent Averill read him back his statement and that he signed each page of the it.

and Michael Cooksey (a/k/a "Money Mike") were involved in selling crack cocaine through a dial-a-dope operation[6] using cell phone number 313-739-4771.  On November 15, 2007 ATF Special Agent Richard Jury, acting in an undercover capacity, called that cell phone number and spoke with a male and arranged a purchase of a half ounce of crack cocaine.  Jury was told to meet the seller in the area of the intersection of Faust and Belton in Detroit.

Agent Jury testified that he had previously successfully arranged a purchase of drugs by calling this same cell phone number on November 6, 2007.  On November 6th, the drugs were delivered to him in the same Faust and Belton area by Michael Cooksey who arrived on the scene in a red four-door vehicle.  Cooksey was alone on that date.

On November 15, 2007, prior to going to the Faust and Belton area to make the drug purchase, Jury met with the case agents and other task force agents who would be working the surveillance detail at the police station for a "pre-buy briefing."  At this pre-buy briefing, Jury and the surveillance crew were shown black and white photographs of potential individuals who might be distributing  narcotics using the targeted cell phone number, and were advised of any relevant criminal histories, particularly any history relating to violence or carrying firearms.  Agent Jury testified that these pre-buy briefings were done in order to secure the safety of the undercover and surveillance agents.  The

---

[6]  A "dial-a-dope" operation is where a person calls a phone number, requests an order of drugs, and is then instructed on matters such as price, meet location, and the mode of transportation of the drug courier who will complete the drug transaction.

8

pictures Jury was shown on November 15th were of Defendant Jerome Campbell (a/k/a "Mozart") and Michael Cooksey (a/k/a "Money Mike").

Agent Jury testified that he went to the Faust and Belton intersection on November 15th, and shortly thereafter a black four-dour Mercury Marauder with two occupants arrived and pulled around the corner on Belton. Jury testified that Michael Cooksey was one of the two occupants of the vehicle. (The other occupant was the driver.) Cooksey was seated in the front passenger seat of the car. Agent Jury testified that he recognized Cooksey as the same person who on November 6th had driven a red car and sold him drugs. Agent Jury testified that he believed that the driver of the black Marauder on November 15th was Jerome Campbell.

Agent Jury testified that Michael Cooksey motioned for him to pull around the corner where he was parked on westbound Belton. Jury turned eastbound onto Belton and pulled along side the Marauder facing westbound so that he and the driver of the Marauder were side-by-side. Cooksey engaged Jury in a conversation. After a brief verbal exchange with the driver as to whether the "weight was straight" and whether Jury's "money was straight," Jury handed the driver $370 and the driver handed Jury a plastic baggie containing 8.5 grams of crack cocaine. According to Jury, a total of approximately 10 seconds elapsed from the time he pulled along side the Marauder until the deal was done.

Ten minutes after the deal was done, Jury and the surveillance crew reconvened with the case agents at the station for a "post-buy briefing." At that briefing, Jury was

9

shown the same pictures he was shown at the pre-buy briefing in order to identify the persons he had just encountered. Jury testified that he had no problem identifying Michael Cooksey as the passenger in the Marauder but that he was not 100 percent certain that the driver was Jerome Campbell. Agent Jury explained that because he was engaged in a conversation with Cooksey while doing the deal, he had not concentrated on the driver. He could only say that he was 75 to 80% sure that the person who sold him the crack on November 15th was Jerome Campbell. Because Jury could not say with 100 percent certainty that the person who sold him the drugs on November 15th was Jerome Campbell, it was decided not to charge Campbell for narcotics trafficking on that date.

THE DECEMBER 6, 2007 UNDERCOVER BUY

On November 19, 2007, ATF Agent Donna Averill received information that Jerome Campbell and Michael Cooksey were using a new cell phone number, 313-662-4080, for their dial-a-dope narcotics trafficking operation. The decision was then made to do another undercover drug buy from Campbell. At 12:30 p.m., on December 6, 2007, Agent Jury placed a phone call to the new cell phone number and spoke with a male about making a purchase of an ounce of crack cocaine. The seller agreed to meet Jury with the drugs in the same Faust and Belton area as the two previous buys done by Agent Jury.

Prior to deploying to do the buy, as with the previous buy, Jury and the surveillance team met with the case agents and were shown photos, this time in color, of potential sellers Campbell and Cooksey.

10

Jury and the seller had several brief conversations on the phone over the next hour and a half while the seller kept Jury apprised of his whereabouts, the reason for his delay in arriving, and estimated time of arrival. The seller advised Jury that he would be driving a black van.

Agent Jury testified that the seller finally arrived in the area around 2:40 p.m., driving a black Chevy Lumina minivan bearing license plate number 8JHM29. The black van passed Jury's vehicle and then backed up along side him. Jury testified that his driver's door was a few inches lower than the van so he had to look up to see the driver. He said that the driver tossed a clear plastic baggie containing crack out of his window but instead of reaching Jury's window, the baggie hit the upper door jam of his car and bounced to the street. As they remained facing each other, Agent Jury handed the driver $400 in cash. Campbell then instructed Jury to "pick that shit up," referring to the baggie that fell to the street. Agent Jury recognized the driver's voice as being the same voice he had heard on the phone earlier that day. Then, upon opening the door to pick the baggie up off the ground, Jury had occasion to study the driver's face.

Agent Jury testified that he got a good look at the driver for three to five seconds when he initially passed Jury's vehicle and then after the black van had pulled parallel to Jury's car, he had a good visual of the driver for approximately 10 to 15 seconds.

Shortly after the drug transaction was completed, Agent Jury returned to the station for a post-buy briefing. He was shown the same color photos of Campbell and Cooksey that he had been shown earlier to verify the identity of the person he had just

11

encountered.  After looking at the photos, Agent Jury positively identified Campbell as the individual in the black van who had sold him the crack.   Jury testified that he is 100% sure that the seller on December 6, 2007 was Campbell.

With regard to the photographs, Agent Jury testified that having seen the photograph of Defendant Campbell before the deal did not plant suggestively in his mind a picture of the person he was going to do the deal with or otherwise alter his perception of Campbell.  He further testified that Jerome Campbell and Michael Cooksey did not look at all alike.

On February 19, 2008, a complaint and warrant were sworn out, and Campbell was thereafter arrested.  After a preliminary examination held on February 25, 2008, Magistrate Judge R. Steven Whalen found probable cause supported the complaint and arrest.  On April 16, 2008, the Grand Jury returned the instant one-count indictment charging Campbell with distribution of more than five grams of cocaine base on December 6, 2007.


III.  <u>CONCLUSIONS OF LAW</u>

<u>CAMPBELL'S SUPPRESSION MOTIONS</u>

Campbell now seeks to suppress the statements he made and the evidence arising the August 1, 2007 vehicle stop.  Campbell argues that the stop for motor vehicle violations was pretextual such that the Government should be precluded from offering his statements and evidence obtained from the stop for any purpose.  He also seeks to

12

suppress Agent Jury's testimony identifying him as the seller of crack on December 6, 2007 claiming that showing Jury photos of Campbell before and after the buy was impermissibly suggestive and that Jury's identification testimony, therefore, should be suppressed.

A.   <u>THE AUGUST 1, 2007 VEHICLE STOP</u>

The Government intends to offer evidence of the August 1, 2007 traffic stop as proof of identity relevant to the charged offense pursuant to Fed. R. Evid. 404(b).  The Government's theory is that because Campbell was stopped in August 2007 driving the same black Chevy Lumina van with the same license plate that he was driving during the undercover narcotics sale on December 6, 2007 (the charged offense), evidence of the traffic stop -- during which narcotics (including crack cocaine) were found and, in connection with which Campbell made statements admitting to selling narcotics -- is probative of identity.

1.    APPLICABILITY OF *MIRANDA* AND THE FOURTH AMENDMENT
      EXCLUSIONARY RULE TO 404(b) EVIDENCE.

The general rule is that evidence of an independent and separate crime, while
inadmissible to prove the guilt of one on trial for a criminal offices, is admissible where it
tends to aid in identifying the accused as the person who committed the particular crime.
*See* Fed. R. Evid. 404(b).[7]  Putting aside for the moment Rule 404(b)'s requirement of a
proper purpose, the precise issue presented in Defendant's motion is whether *Miranda*
and/or the Fourth Amendment exclusionary rule applies to 404(b) evidence.  This issue,
however, was not raised or even mentioned by either party.

The Court's independent research has not revealed any cases addressing the issue
in the context of *Miranda* violations.  However, several courts have addressed the
question of whether the Fourth Amendment's exclusionary rule applies to 404(b)
evidence and all of those courts agree that it does, at least under certain circumstances.
*See e.g., United States v. Hill*, 60 F.3d 672 (10th Cir.), *cert. denied*, 516 U.S. 970 (1995);
*United States v. Hill*, 898 F. 2d 72 (7th Cir. 1990); *United States v. Lopez-Martinez*, 725
F.2d 471 (9th Cir.), 469 U.S. 837 (1984); *United States v. Renteria*, 625 F.2d 1279 (5th
Cir. 1980); *United States v. Knight*, 185 F. Supp. 2d 65 (D.D.C. 2002); *United States v.*

―――――――――――

[7]  Rule 404(b) provides, in relevant part:

   Evidence of other crimes, wrongs, or acts is not admissible to prove the
   character of a person in order to show action in conformity therewith.  It
   may, however, be admissible for other purposes, such as proof of motive,
   opportunity, intent, preparation, plan, knowledge, identity, or absence of
   mistake or accident. . . .

14

*Ozuna*, 129 F. Supp. 2d 1345 (S.D. Fla. 2001), *aff'd*, 48 Fed. Appx. 739 (11th Cir. 2002); *United States v. Perez*, 562 F. Supp. 574 (D.N.J. 1982). It does not appear that the Sixth Circuit has addressed this issue.

In *United States v. Hill*, 60 F.3d 672 (10th Cir. 1995), the defendant was convicted on one count of possession of cocaine base and one count of possession of a firearm in connection with a drug trafficking offense. At trial, over Hill's objection, the district court admitted police officers' testimony that Hill had possessed cocaine base during two prior arrests for which he was never charged under Rule 404(b) to show Hill's "knowledge" or "intent" with respect to the cocaine base possession charge on which he was being tried.

Hill argued before the trial court -- and again before the appellate court -- that evidence of the prior possessions should have been excluded because the evidence was obtained through unlawful searches and seizures.

The district court did not address whether the evidence of the prior possessions was obtained in violation of the Fourth Amendment because it held that the exclusionary rule simply does apply to evidence admitted under Rule 404(b). The Tenth Circuit held to the contrary, that "the exclusionary rule does apply where, as here, the alleged unlawfully obtained evidence is being used to prove an essential element of a charged offense -- at least where there is some nexus between the initial search and seizure and the subsequent charged offense." 60 F.3d at 677. The Tenth Circuit reasoned,

15

> This holding is consistent not only with the Supreme Court's general
> philosophy that the exclusionary rule ensures that individuals not be
> convicted on unconstitutional evidence, but also with its more specific
> emphasis on the rule's deterrence rationale.  By testifying to the prior
> possessions at trial, the police who conducted the prior alleged unlawful
> searches and seizures actively participated in using that evidence under
> Fed.R.Evid. 404(b) to obtain a conviction.

*Id.* (internal punctuation and citations omitted).

Despite the holding that the exclusionary rule applies to evidence under Rule 404(b), however, the *Hill* court acknowledged that the Fourth Amendment "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings against all persons." *Id.* at 679.[8]  The court explained, "Where the connection between police misconduct and evidence of a crime is sufficiently attenuated, we agree that exclusion neither protects the constitutional principles the rule was designed to protect, nor advances deterrence enough to justify its costs.  However, that level of attenuation only occurs where the use of the illegally seized evidence falls, in the words of the Supreme Court, 'outside the offending officer's zone of primary interest.'" *Id.* (quoting *United States v. Janis*, 428 U.S. 433, 458, 96 S.Ct. 3021, 3034 (1976) (limiting exclusionary rule's effect in subsequent civil proceedings by a separate

---

[8]  The court specifically acknowledged the "exclusionary rule exceptions" recognized by the Supreme Court, i.e., that the rule has been held not to bar the use of illegally obtained evidence in grand jury proceedings, *United States v. Calandra*, 414 U.S. 338 (1974), for impeachment purposes, *Walder v. United States*, 347 U.S. 62 (1954), when a defendant attempts to assert the Fourth Amendment rights of another, *Rakas v. Illinois*, 439 U.S. 128 (1978), and as grounds for a writ of habeas corpus in collateral review, *Stone v. Powell*, 428 U.S. 465 (1976).

16

sovereign)).  The *Hill* court found, however, that

> Here, however, the very officers who conducted the earlier criminal
> investigation, including a drug investigation, of this defendant were called
> upon to testify about that drug involvement in order to obtain a drug
> conviction against the same defendant for conduct that occurred just a few
> months of their initial investigations.  All of this is a close enough nexus to
> convince us that the ultimate use of this evidence fell within the officers'
> zone of primary interest at the time these searches and seizures occurred.

*Id.* at 680.

Thus, the Tenth Circuit concluded that in cases involving constitutional challenges

to Rule 404(b) evidence, courts should conduct a two-step inquiry: "admitting the

evidence only if it *both* meets the technical requirements of Rule 404(b) *and* was not

obtained in violation of the defendant's Fourth Amendment rights."  *Id.*[9]

The Tenth Circuit's *Hill* decision is consistent that the rulings of the other circuits

that have addressed this issue.  For example, in *United States v. Hill*, 898 F.2d 72 (7th

Cir. 1990), the Seventh Circuit held that the constitutionality of a search from a prior

arrest must be determined before admitting the fruits of that search against a defendant in

a later trial under Rule 404(b).  Notably, the Seventh Circuit concluded that an

"independent finding concerning the constitutionality of the seizure" is required even if

the same issue is currently being litigated in a state court.  *Id.* at 74.  Because the district

---

[9] Although the *Hill* court determined that the district court erred in not ruling on
Hill's Fourth Amendment challenge, the appellate court ultimately concluded that the
error was harmless in light of the abundance of strong uncontroverted evidence
supporting the conviction.  Therefore, the court found no need to remand the case for the
district court to rule on the Fourth Amendment claims it should have addressed in the first
place.  *Id.* at 681.

17

court did not hold an evidentiary hearing, the Seventh Circuit remanded the case for a determination of whether the Rule 404(b) evidence was unconstitutionally obtained, and ordered a new trial if the search was found to have been unlawful. *See id.* at 76. *See also, United States v. Renteria*, *supra*, 625 F.2d at 1281-82 (holding evidence of a prior offense admissible under the requirements of 404(b) "[u]nless barred by the Fourth Amendment," and remanding for the district to court to rule on defendant's Fourth Amendment claim); *United States v. Ozuna*, *supra*, 129 F. Supp. 2d at 1351 ("Sheltering Rule 404(b) evidence from the exclusionary rule would open a back door to the admission of unconstitutionally obtained evidence and frustrate the policy of deterrence which underlies the rule.")

A few courts, however, have placed some narrow constraints on the applicability of the exclusionary rule to 404(b) evidence. For example, the Ninth Circuit in *United States v. Lopez-Martinez*, *supra*, 725 F.2d at 475-76, while the court acknowledged that the exclusionary rule might apply to bar admission of 404(b) evidence, the court determined that a case-by-case approach should be taken, and in that case, held that the nexus between the proffered 404(b) evidence of an arrest eight years earlier for marijuana possession and the subsequent trial for heroin possession was too attenuated to serve any deterrent effort by invoking the exclusionary rule. Similarly, in *United States v. Nolan*, 551 F.2d 266 (10th Cir.), *cert. denied*, 434 U.S. 904 (1977), the court declined to consider the exclusionary rule with regard to 404(b) evidence where it was not being

18

used to prove an element of the crime charged.[10]  More recently, in *United States v. Basinger*, 60 F.3d 1400, 1407 (9th Cir. 1995), the Ninth Circuit upheld the introduction of evidence of a prior arrest and found that a constitutionality assessment was "unnecessary because the Fourth Amendment does not bar admission of this evidence." *Id.*  The court found that the exclusionary rule did not bar introduction of the evidence because there was no "'bad faith or collusion by the officers involved in the prior and the instant cases,' and the officer in the prior case did not have the [instant] proceedings in [his] primary zone of interest." *Id.*  (citation omitted.)  "Thus, even if the 1991 search was illegal, exclusion of the evidence in the present case would be unwarranted because exclusion would have a minimal deterrent effect." *Id.*

Similarly, in *United States v. Knight*, 185 F. Supp. 2d 65 (D.D.C. 2002), the court held that the exclusionary rule did not bar admission of the defendant's arrest two years earlier.  While the court declined to apply *Hill*'s "primary zone of interest test" because it found it "unnecessarily vague,"it found the arrests too attenuated because they "were a year apart, and were conducted by different groups of officers [and] [t]here is no evidence of collusion or bad faith between the groups of officers." *Id.* at 69.

From these authorities, it would appear that a case-by-case approach should be

---

[10]  In *Nolan* the 404(b) evidence had been gathered by a British Customs agent in London.  As the *Hill* court noted, "although not discussed by the [*Nolan*] court, it seems self evident that applying United States exclusionary rules is unlikely to have any meaningful deterrent effect on unrelated conduct by foreign law enforcement officials in their own countries." *Hill*, 60 F.3d at 680 n. 5.

19

taken in determining whether the exclusionary rule applies to 404(b) evidence of a prior arrest.  Unlike the Tenth Circuit *Hill* case, here the evidence is not being offered to prove an element of the crime.  Nor is there any evidence of collusion or bad faith on the part of the officers.  There is, in fact, no evidence to suggest that the officers involved in the August 1 stop had any involvement whatsoever with any of the undercover narcotics transactions involving Defendant and Agent Jury.  On the other hand, the August 1 arrest here was not too remote in time -- it occurred only four months prior to the December 6 drug deal -- nor were the August 1 and December 6 crimes too distinct in character. Thus, the Court cannot say that the nexus would be too attenuated to warrant application of the exclusionary rule.  Therefore, the Court will take the approach of the Seventh Circuit and determine whether the evidence of the prior arrest both meets the requisites of Rule 404(b) *and* passes constitutional muster.  This Opinion and Order addresses the constitutional issues.[11]

2.      THE OFFICERS HAD PROBABLE CAUSE TO BELIEVE THAT
        DEFENDANT HAD COMMITTED TO MOTOR VEHICLE VIOLATIONS

        It is well-settled that police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime.  *Terry v. Ohio*, 392 U.S. 1, 28, 88 S.Ct. 1868, 1883 (1968);*United States v. Shank*, 543 F.3d 309, 312

---

[11]  The Rule 404(b) "proper purpose" issue is the subject of Defendant's separately-filed "Motion *in Limine* to Exclude Government's Use of Proposed Evidence Pursuant to Fed. R. Evid. 404(b)." The Government has not yet responded to this Motion. Because the Court finds that motions *in limine* are more properly characterized as trial motions, the Court will withhold ruling on this Motion until trial.

(6th Cir. 2008)*; Houston v. Clark County*, 174 F.3d 809, 813 (6th Cir. 1999).  In *United States v. Sokolow*, 490 U.S. 1 (1989), the Supreme Court held that "reasonable suspicion" entails only "some minimal level of objective justification" for making an investigative stop -- that is "something more than an inchoate and unparticularized suspicion or 'hunch', but less than the level of suspicion required for probable cause." *Id.* at 7. According to the Sixth Circuit,

> Reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity." *Houston*, 174 F.3d at 813 (alterations in original) (internal quotations and citation omitted). It requires " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' an investigatory stop." *Id*. (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Moreover, reasonable suspicion "can arise from evidence that is less reliable than what might be required to show probable cause." *Id*.

*United States v. Shank, supra*, 543 F.3d at 312 (quoting *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir.2003)).  *See also, United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) ("While an officer making a *Terry* stop must have more than a hunch, 'reasonable suspicion' is considerably less than proof of wrongdoing by a preponderance of the evidence.")

      When a police officer observes a traffic violation--however minor--he has probable cause to stop the vehicle. *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir.1990), *cert. denied*, 502 U.S. 962 (1991).  *See also, Wren v. United States*, 517 U.S. 806 (1996) (a law enforcement officer may make a traffic stop, regardless of subjective motivation, if he has probable cause to believe that a traffic violation has been

committed); *United States v. Ferguson*, 8 F.3d 385 (6th Cir.), *cert. denied*, 513 U.S. 828

(1994).[12]

Here, Officers Connor and Huelsenbeck had probable cause to believe that two

traffic violations had occurred which prompted them to stop Defendant: failing to signal

before turning, a violation of Detroit City Code § 55-4-22,[13] and operating a motor

--------

[12] Though it is clear that the "reasonable suspicion" *Terry* stop standard applies to suspected ongoing criminal activity, there is some confusion in the Sixth Circuit as to whether this lesser standard also applies to civil traffic infractions. *Compare Weaver v. Shadoan*, *supra* 340 F.3d at 407-08 (upholding stop where police had "reasonable suspicion" of a violation of vehicle registration and window tinting regulations) with *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (invalidating stop where police lacked "probable cause" to stop vehicle for failure to stay in lane); and *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.), *cert. denied*, 513 U.S. 828 (1994) (stating in dictum that probable cause is required for a stop premised on traffic violation). *See also Gaddis v. Redford Township*, 364 F.3d 763 (6th Cir. 2004) (discussing these conflicting decisions and holding that, because drunk driving is a criminal offense in Michigan, police only needed to show that they had a reasonable suspicion that the driver was intoxicated); *United States v. Sanford*, 476 F.3d 391 (6th Cir. 2007) (because driving behind another vehicle more closely than reasonable is a misdemeanor under Tennessee law, reasonable suspicion standard applied). However, because the Court finds that the officers here had probable cause to stop Campbell for the traffic violations, it need not concern itself with the apparent conflict with respect to whether the lesser reasonable suspicion standard should apply.

[13] Section 55-4-22 of the Detroit City Code provides:

Before turning to the right or left, the operator shall drive the vehicle into the proper lane for such turn and before stopping or before materially varying the course in which the vehicle is proceeding, the operator shall first ascertain that such stopping, variation in course or turning maneuver can be made in safety, and shall give a warning signal to other operators by extending the arm, beyond and outside the vehicle, holding the same in a horizontal position for a sufficient time to apprise approaching operators of his intention to vary his course, stop or turn, as the case may be; provided, that in lieu of such signal, signals may be given by mechanical or electrical

vehicle without wearing a seat belt, a violation of the Michigan Motor Vehicle Code,

M.C.L. § 257.710e.[14]

Officers Connor and Huelsenbeck provided specific and articulable facts to believe

that Defendant committed these two traffic offenses.  Both officers testified that they

observed Defendant exiting the driveway in front of Tom's Coney Island and turn onto

Schoolcraft without signaling.  They both also testified that Defendant was not wearing a

seatbelt at the time.   The Court credits the officers' testimony.  Therefore, the stop was

reasonable and lawful under the Fourth Amendment and there was no illegal stop or

---

devices which convey an intelligible warning to other operators
approaching from the front or rear.

Section 55-1-1 of the City Code provides:

Civil infraction  means an act or omission that is prohibited by this Code
which is not a crime as defined in Section 5 of the Michigan Penal Code,
being MCL 750.5, and for which civil sanctions may be ordered.

[14]  M.C.L. § 257.710e provides in pertinent part:

(3) Each driver and front seat passenger of a motor vehicle operated on a
street or highway in this state shall wear a properly adjusted and fastened
safety belt. . . .

* * *

(7) A person who violates this section is responsible for a civil infraction.

M.C.L. § 257.710e(3), (7).

"Civil infraction" is defined in M.C.L. §257.6a:

"Civil infraction" means an act or omission prohibited by law which is not
a crime. . . and for which civil sanctions may be ordered.

23

seizure to render the subsequently discovered evidence or Defendant's statement admitting that the drugs belonged to him "fruits of the poisonous tree." *Whren*, 517 U.S. at 810; *see also United States v. Graham*, 483 F.3d 431, 437 (6th Cir. 2007).

Defendant argues that the stop was pretextual suggesting that the officers wanted to stop him for gang or narcotics activities but could not support such a stop with probable cause. "A pretextual stop occurs when the police use a legal justification to make a stop . . . in order to search a person or his vehicle, or interrogate him, for an unrelated and more serious crime for which they do not have the reasonable suspicion necessary to support a stop." *United States v. Huguenin*, 154 F.3d 547, 559 n. 10 (6th Cir.1998). Defendant, however, has presented no evidence to support this contention and the testimony at the evidentiary hearing provides no support for this argument, either.

Officers Huelsenbeck and Connor both testified that at the time of they effected the traffic stop they did not know the identity of the driver of the van. However, prior to August 1, 2007, as task force members, the officers had been briefed by their commanding officers and federal agents as to individuals targeted for investigation by, or "of interest" to, the authorities with respect to suspected narcotics and firearm violations, and that they were asked to notify the federal authorities if a person "of interest" were arrested. ATF Task Force Agent Donna Averill testified that she had informed task force members that Jerome Campbell was one such person "of interest" who she wanted to talk to.

Officer Connor testified that prior to August 1, 2007, he was made aware that

24

Jerome Campbell was an individual who the authorities wanted to talk to. He testified that prior to August 1, 2007, he had been told Campbell's name and had been given a verbal description of him and his vehicle. However, he stated that he did not know that it was Campbell who was driving the black Lumina when he and his partners observed the motor vehicle violations giving rise to the stop. He testified that it was not until he had pulled Mr. Campbell over that he made the identification and the connection with him being a person of interest to the federal authorities. The Court fully credits Officer Connor's testimony.

In sum, the Court finds no credible evidence to support Defendant's "pretextual stop" argument.

3.   THE OFFICERS HAD PROBABLE CAUSE TO SEARCH
      DEFENDANT'S VEHICLE

To determine the legality of the police officers' warrantless search of Defendant's car, the Fourth Amendment demands a reasonableness analysis of the officers' conduct. A police officer may continue detention of a stopped motorist upon a "reasonable and articulable suspicion that [the defendant] was engaged in additional criminal activity." *United States v. Erwin*, 156 F.3d 818, 822 (6th Cir. 2006) (*en banc*), *cert. denied*, 525 U.S. 1123 (1999). Officer Connor testified that he observed Defendant stuffing an object into the ceiling of his vehicle when he was pulled over. This testimony was corroborated by Officer Huelsenbeck's testimony that he saw Defendant raise his hands to the ceiling of the vehicle (although he could not discern what precisely Defendant was doing.)

25

Officer Connor further testified that he then observed a corner of a plastic baggie protruding from the gap in the ceiling liner. Because the traffic stop was conducted in an area known to the officers as being rife with gang violence and narcotics trafficking, Defendant's movements provided the officers with sufficient articulable facts to believe that Defendant was attempting to conceal contraband in the ceiling. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that high crime area is a relevant consideration in determining whether officers had a reasonable suspicion of criminal activity); *United States v. Clay*, 2006 WL 1408119 (6th Cir. 2006) (holding that reasonable suspicion existed from a combination of finding defendants in a parked car in a high crime area and rapid hand movements in response to the sight of police officers).

4. DEFENDANT'S STATEMENTS PRIOR TO ARRIVING AT THE POLICE STATION

Defendant argues that because he was not read his *Miranda* rights before he arrived at the Northwest District station, the statements he made prior to arriving at the station should be suppressed. The law is well established, however, that in order for *Miranda* rights to be triggered, an individual must be subjected to custodial *interrogation* by the police. *Oregon v. Elstad*, 470 U.S. 298, 360 (1985). It is undisputed that, at the time Defendant made the disputed statements, he was "in custody." The Supreme Court has held that for purposes of *Miranda*, a person is in custody if "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429

26

U.S. 495 (1977)).  However, "custodial interrogation" requires "questioning initiated by law enforcement officers."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  This includes the functional equivalent of direct interrogation, i.e., use of conduct by police reasonably likely to produce incriminatory statements by the person in custody.  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  On the other hand, statements voluntarily initiated by defendants, absent police interrogation or its functional equivalent, are admissible even in the absence of *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. at 478.

The test for voluntariness of a statement is whether it was the product of free and rational choice.  *United States v. Marks*, 209 F.3d 577, 583 (6th Cir.), *cert. denied*, 531 U.S. 882 (2000).  Determining whether a statement was voluntarily given is a two-pronged analysis taking into account the totality of the circumstances.  *United States v. Calhoun*, 49 F.3d 231, 235 (6th Cir. 1995); *United States v. Murphy*, 763 F.2d 202 (6th Cir. 1985), *cert. denied*, 474 U.S. 1063 (1985).  The inquiry considers (1) the conduct of law enforcement officials in creating pressure on the defendant and (2) the defendant's capacity to resist that pressure.  *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 520 (1986).  In *Colorado v. Connelly*, the Supreme Court emphasized that official coercion is a necessary element of the two-pronged totality of the circumstances analysis.  *Id*. at 170.

A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality. . . .  Reliance on vague, conclusory allegations is insufficient."  *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992).  Thus, a defendant must present "definite, specific, detailed and nonconjectural" facts that justify

27

the relief requested. *Id.*

With these standards in mind, the Court turns to Defendant's statements in this case. For the sake of clarity, the Court will consider these statements separately.

a.    Defendant's Admission of Ownership of the Drugs Contemporaneous to Their Discovery

Defendant's first statement occurred when he proclaimed contemporaneously with the discovery of the drugs in the ceiling of his vehicle, "The dope is mine." Defendant's only argument of illegality of this statement is his argument that the stop and search were illegal. As discussed above, the Court rejects this argument. Defendant does not allege any specific facts or conduct to prove that his statements were the product of police actions that defeated his will. Specifically, Defendant does not allege that he was in police custody when this first spontaneous statement. Nor does he allege that this statement was a response to any police interrogation or its functional equivalent. Officer Connor testified that after he retrieved the drugs from the ceiling, Defendant spontaneously blurted out, "The dope is mine. Please don't fuck with my people." The Court credits Officer Connor's testimony.

The Court, therefore, concludes that Defendant Campbell's statement admitting ownership of the drugs in the ceiling was a voluntary, non-custodial, uncoerced statement. Accordingly, the statement "the dope is mine" will not be suppressed.

b.    Defendant's En Route Monologue about his Ability to Purchase Drugs

Defendant also made statements while in the police car during transit to the police

28

station in which he talked about his ability to purchase a large quantity of drugs from an individual known as "Chop."  The Government concedes that Defendant was in police custody when he made this statement.  Although Defendant claims that he did not make any spontaneous statements while en route to the station, he also does not claim that this statement was a response to police questioning or its functional equivalent.  Officer Connor testified that Defendant engaged in an uncoerced and voluntary monologue about knowing a person named "Chop" on Joy Road from whom he could obtain a large quantity of drugs and the Court credits Connor's testimony.  Accordingly, the Court concludes that Defendant's statements about "Chop" and his ability to purchase a large quantity of drugs from him were voluntary and admissible, even though Defendant was in police custody at the time he made these statements.

c.      Pre-*Miranda* Questioning by Officer Connor

After Defendant finished his monologue about Chop, Officer Connor questioned Defendant about selling drugs without giving *Miranda* warnings.  It is undisputed that Defendant answered two questions asked by Officer Connor.  The questions pertained to how much the large piece of crack found in Defendant's van would sell for.  Although Defendant did not view this as having constituted police interrogation implicating his *Miranda* rights  -- "It was just a conversation we was having." 12/16/08 Tr. p. 98 -- the Government stated in its Response Brief that it is willing to concede that Defendant's answers to Officer Connor's questions "were arguably in violation of *Miranda*."  The Court agrees. Because Defendant was in custody and did not receive *Miranda* warnings,

29

the statements elicited by Officer Connor's questions are "irrebuttably presumed involuntary." *United States v. Pacheo-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008) (quoting *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2007)). Therefore, Defendant's statements in response to Officer Connor's questions concerning the price of crack will be suppressed.

d.    Post-*Miranda* Stationhouse Questioning

As noted above, Defendant does not challenge the statements he gave to ATF Agent Averill as violative of his *Miranda* rights. He does argue, however, that these statements should be suppressed as "fruit of the poisonous tree" stemming from his pre-Miranda statements. However, in *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court held that the "fruit of the poisonous tree" doctrine is inapplicable in the Fifth Amendment *Miranda* context. The Court held:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 310-11.

The Sixth Circuit continues to follow the rule pronounced in *Elstad* and has rejected the argument that an incriminating statement made in response to custodial interrogation tainted a similar subsequent statement made after *Miranda* warnings were

30

given.  *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003); *see also United States v. Crowder*, 62 F.3d 782, 786 (6th Cir. 1995), *cert. denied*, 516 U.S. 1057 (1996) (voluntary unwarned statements do not taint a subsequent warned statement).

In this case, both Defendant's spontaneous statement about ownership of the drugs and his unwarned monologue about Chop and his ability to obtain from him a large quantity of drugs were both voluntary and similar in nature and scope to his warned stationhouse statements.   Therefore, these statements provide no legal basis for suppression of his post-*Miranda* statements.

To the extent that Defendant contends that the pre-*Miranda* questioning by Officer Connor broke the chain of voluntary statements and tainted the post-*Miranda* admissions, as the *Elstad* Court observed, "[T]hat a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.  *Elstad*, 470 U.S. at 318.  "Once warned, the  suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities."  *Id.* at 308.

By application of the foregoing authorities, the Court concludes that Defendant's post-*Miranda* statements should not be suppressed.  Agent Averill testified that she read Defendant his *Miranda* rights before questioning him.  Though Defendant disputes precisely when Agent Averill read him his rights, Defendant acknowledged his signature on the Waiver of Rights form provided to him by Agent Averill.  Under these circumstances, the Court finds that any "taint" caused by Officer Connor's pre-*Miranda*

31

questioning has been cured.

For all of the foregoing reasons, Defendant's "Motion to Suppress Statements and Evidence from Vehicle Stop" will be denied except with respect to Defendant's responses to Officer Connor's questions concerning the selling price of the large rock of crack found in Defendant's van. These statements will be suppressed.

B.    AGENT JURY'S IDENTIFICATION OF DEFENDANT IN THE DECEMBER 6, 2007 DRUG TRANSACTION

Defendant Campbell also seeks to suppress Agent Jury's identification of him in the December 6, 2007 drug transaction as violative of due process because it was unduly suggestive and unreliable.

The Supreme Court has held that due process requires exclusion of testimony of a pretrial identification when the identification procedures used were unnecessarily suggestive and thus conducive to mistaken identification that cannot be repaired. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). *See also Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986), *cert. denied*, 482 U.S. 918 (1987) ("A conviction based on identification testimony following pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.")

In *Stovall*, the defendant was brought to the hospital bed of a witness two days after the offense. The witness was asked whether "he was the man" and the witness identified him as her assailant both while in the hospital and again at trial. Though the

32

Court noted that the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," *id.* at 302, the Court held that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances." *Id.* In deciding *Stovall*, the Court stressed the necessity of the procedure used in that case and ultimately found that the police used the only possible procedure under the circumstances.

Courts have since *Stovall* utilized a two-prong test to determine whether a pretrial identification violates a defendant's constitutional right to due process. *See Thigpen, supra.* "First, the court evaluates the undue suggestiveness of the preidentification encounters. If the encounters were unduly suggestive, the court evaluates the 'totality of the circumstances' to determine whether there are nevertheless sufficient independent indicia of reliability." 804 F.2d at 895 (citing *Neil v. Biggers,* 409 U.S. 188, 199-200, 93 S.Ct. 375, 382-83 (1972)). (*Thigpen* involved "live" pretrial "encounters" between the defendant and the robbery victim who was the only eyewitness to the incident.)

A criminal defendant has the initial burden of proving that the identification procedure was impermissibly suggestive. It is only after a defendant meets this burden of proof that the burden then shifts to the prosecutor to prove that the identification was reliable independent of the suggestive identification procedure. *See Johnson v. Warren*, 344 F. Supp. 2d 1081, 1090 (E.D. Mich.2004) (citing *English v. Cody*, 241 F.3d 1279, 1282-83 (10th Cir.2001) (citing *United States v. Wade*, 388 U.S. 218, 240, n. 31 (1967)). If a defendant fails to show that the identification procedures were impermissibly

33

suggestive, or if the totality of the circumstances indicate that the identification is

otherwise reliable, no due process violation has occurred; so long as there is not a

substantial misidentification, it is for the jury or factfinder to determine the ultimate

weight to be given to the identification. *See United States v. Hill*, 967 F.2d 226, 230 (6th

Cir.), *cert. denied*, 506 U.S. 964 (1992);   *Summit v. Bordenkircher*, 608 F.2d 247, 253

(6th Cir. 1979); *Johnson*, 344 F. Supp.2d at 1090.

   *Manson v. Braithwaite*, 432 U.S. 98 (1977), involved a pretrial photographic

identification and an identification witness who was, as in this case, an undercover

officer.  The officer in *Manson*, Jimmy Glover, was shown a single photograph of the

defendant by another officer, D'Onofrio, two days after he made an undercover drug buy

from the defendant.  The drug-buy encounter had been a face-to-face encounter that lasted

at most five to seven minutes.  However, Glover was able to give D'Onofrio a good

description of the defendant and it was based on this description that D'Onofrio selected

the photograph to show Glover which elicited his identification of Braithwaite two days

later.  Glover then again identified Braithwaite at trial eight months later.

   The Court found the showing of a single photograph to the undercover agent was

unduly and unnecessarily suggestive.  However, examining the totality of the

circumstances, the Court found no violation of due process.  The Court explained:

>    [R]eliability is the linchpin in determining the admissibility of
> identification testimony for both pre- and post-*Stovall* confrontations. The
> factors to be considered are set out in [*Neil v*.] *Biggers*, 409 U.S. [188].
> 199-200, 93 S.Ct., at 382. [(1972)].  These include the opportunity of the
> witness to view the criminal at the time of the crime, the witness' degree of

attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

We turn, then, to the facts of this case and apply the analysis:

1. The opportunity to view. Glover testified that for two to three minutes he stood at the apartment door, within two feet of the respondent. The door opened twice, and each time the man stood at the door. The moments passed, the conversation took place, and payment was made. Glover looked directly at his vendor. It was near sunset, to be sure, but the sun had not yet set, so it was not dark or even dusk or twilight. Natural light from outside entered the hallway through a window. There was natural light, as well, from inside the apartment.

2. The degree of attention. Glover was not a casual or passing observer, as is so often the case with eyewitness identification. Trooper Glover was a trained police officer on duty and specialized and dangerous duty when he called at the third floor of 201 Westland in Hartford on May 5, 1970. Glover himself was a Negro and unlikely to perceive only general features of "hundreds of Hartford black males," as the Court of Appeals stated. 527 F.2d, at 371. It is true that Glover's duty was that of ferreting out narcotics offenders and that he would be expected in his work to produce results. But it is also true that, as a specially trained, assigned, and experienced officer, he could be expected to pay scrupulous attention to detail, for he knew that subsequently he would have to find and arrest his vendor. In addition, he knew that his claimed observations would be subject later to close scrutiny and examination at any trial.

3. The accuracy of the description. Glover's description was given to D'Onofrio within minutes after the transaction. It included the vendor's race, his height, his build, the color and style of his hair, and the high cheekbone facial feature. It also included clothing the vendor wore. No claim has been made that respondent did not possess the physical characteristics so described. D'Onofrio reacted positively at once. Two days later, when Glover was alone, he viewed the photograph D'Onofrio produced and identified its subject as the narcotics seller.

4. The witness' level of certainty. There is no dispute that the photograph in question was that of respondent. Glover, in response to a

35

question whether the photograph was that of the person from whom he made the purchase, testified: "There is no question whatsoever." Tr. 38. This positive assurance was repeated. Id., at 41-42.

5. The time between the crime and the confrontation. Glover's description of his vendor was given to D'Onofrio within minutes of the crime. The photographic identification took place only two days later. We do not have here the passage of weeks or months between the crime and the viewing of the photograph.

These indicators of Glover's ability to make an accurate identification are hardly outweighed by the corrupting effect of the challenged identification itself. Although identifications arising from single-photograph displays may be viewed in general with suspicion, *see Simmons v. United States*, 390 U.S., at 383, 88 S.Ct., at 970-971, we find in the instant case little pressure on the witness to acquiesce in the suggestion that such a display entails.

432 U.S. at 114-16.

Turning then to the instant case, the Government's protestations notwithstanding, the photographic identification procedures used here were unduly suggestive.  *See Workman v. Cardwell*, 471 F.2d 909, 910 (6th Cir. 1972), *cert. denied*, 412 U.S. 932 (1973) (investigating police officer's use of a single photograph of the petitioner, from which the victim identified petitioner as the man who had committed the robbery, was "undeniably suggestive.")  However, as *Manson v. Braithwaite* establishes, an identification procedure in which a defendant's photograph is shown singly is not per se unconstitutional. *Manson*, 432 U.S. at 113-114; *United States v. Causey*, 834 F.2d 1277, 1284-85 (6th Cir.1987), *cert. denied*, 486 U.S. 1034 (1988). While the use of a single photograph procedure is suggestive, in-court identification testimony based on such a procedure is to be excluded only if the identification evidence is so unreliable that it

36

creates a substantial likelihood of misidentification. *Causey*, 834 F.2d at 1285.

Examining the totality of the circumstances using the *Neil v. Biggers* factors as called for by *Manson*, the Court finds sufficient indicia of reliability to find Agent Jury's identification testimony admissible.

First, Agent Jury had the opportunity to view Campbell face-to-face at the time of the crime. Their encounter, similar to the encounter between Officer Glover and the defendant in the *Manson* case, lasted only a few moments and, here, occurred in broad daylight in the middle of the afternoon. (In *Chavis v. Henderson*, 638 F.2d 534, 536-37 (2nd Cir. 1989), *cert. denied*, 454 U.S. 842 (1990), the court found a witness's pretrial identification reliable after contact with the offender for only 45 seconds.) Agent Jury observed Campbell both at arm's length, when the agent's vehicle and Campbell's vehicle were positioned driver's side-by-driver's side and for a bit longer period of time when Jury had to pick up the crack cocaine that bounced off his car and into the street. According to Jury, this gave him the opportunity to "study" Campbell's face. Thus, the second *Neil/Manson* factor, the witness's degree of attention, is also satisfied. This is further bolstered by the fact that Agent Jury, like Officer Glover in the *Manson* case, is a trained law enforcement agent trained to pay attention to descriptive detail.

The third and fourth *Neil/Manson* elements -- accuracy of description and level of certainty -- also are met here. When he was shown the photo after the drug deal, Agent Jury said he was 100% certain that the dealer was Campbell. Furthermore, Agent Jury did not only identify Campbell by his appearance but also by his voice. When Campbell

37

told him to "Pick up that sh\*t," he immediately identified Campbell as the person with whom the drug deal was arranged by virtue of the several phone conversations the two had had earlier in the day.  Finally, Jury made the photo identification only moments after the crime.

Balancing these factors against the corrupting effect of showing Agent Jury a single photograph before and after the drug transaction, the Court finds that the indicators of Agent Jury's ability to make an accurate identification are not outweighed by the corrupting effect of the challenged procedure.

For all of the foregoing reasons, the Court will deny Defendant's Motion to Suppress Identification Testimony.  Agent Jury's identification of Defendant Campbell is admissible; its weight will be left to be determined by the jury.

## CONCLUSION

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Identification Testimony **[Dkt. # 15]** is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Suppress Statements and Evidence Arising from Vehicle Stop **[Dkt. # 24]** is DENIED except with respect to his

responses to Officer Connor's questions concerning the selling price of the large rock of

cocaine found in Defendant's van.  These statements will be suppressed.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  April 20, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record
on April 20, 2009, by electronic and/or ordinary mail.

s/Ruth Brissaud
Case Manager